# EXHIBIT 1

## Page 1

```
 1  GENBAND MANAGEMENT SERVICES    :  IN THE DISTRICT
    CORPORATION,
 2                                 :  COURT OF DALLAS
         Plaintiff,
 3                                 :  COUNTY, TEXAS
    v.
 4                                 :  116th JUDICIAL
    COEFFICIENT, LLC AND
 5  TELEFFICIENT, LLC,             :  DISTRICT
 6  Defendants/Counter-Plaintiffs,:
 7  v.                             :  CAUSE NO.
 8  GENBAND MANAGEMENT SERVICES    :  DC-16-12593
    COROPORATION, GENBAND
 9  HOLDINGS COMPANY, and          :
    GENBAND US, LLC,
10                                 :
         Counter-Defendants.
11
12
13    *         *         *         *         *
14
15  Videotaped Deposition of:
16           MARK PUGERUDE,
17  was held Friday, June 29, 2018 commencing at 9:00
18  a.m., at the Law Offices of Baker Botts, LLP, 1299
19  Pennsylvania Avenue, NW, Washington, D.C.  20004,
20  before Goldy Gold, a Registered Professional
21  Reporter and a Notary Public within and for the
22  District of Columbia.
23
24
25
```

## Page 2

```
 1  A P P E A R A N C E S:
 2
 3  ON BEHALF OF THE PLAINTIFF/COUNTER-DEFENDANTS:
 4          JONATHAN B. RUBENSTEIN, ESQ.
            ALLISON SMITH, ESQ.
 5          Baker Botts, LLP
            2001 Ross Avenue
 6          Dallas, Texas 75201
            Telephone:  (214) 953-6594
 7          E:mail:  allison.smith@bakerbotts.com
            jonathan.rubenstein@bakerbotts.com
 8
 9
10
    ON BEHALF OF THE DEFENDANTS/COUNTER-PLAINTIFFS:
11
            TYLER BEXLEY, ESQ.
12          Reese Marketos, LLP
            750 N. Saint Paul Street - Suite 600
13          Dallas, Texas 75201
            Telephone:  (214) 382-9805
14          E-mail:  tyler.bexley@rm-firm.com
15
16
    ALSO PRESENT:  Pat Ruffner, Videographer
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                   I N D E X
 2             Deposition of Mark Pugerude
 3                   June 29, 2018
 4
 5  EXAMINATION BY                               PAGE
 6    MR. BEXLEY                                    5
 7    MR. RUBENSTEIN                              221
 8    MR. BEXLEY                                  236
 9
10
11
12  EXIBITS        DESCRIPTION                   PAGE
13   Exhibit 75    e-mail correspondence           73
14   Exhibit 76    chain of e-mails                97
15   Exhibit 77    chain of e-mails               106
16   Exhibit 78    chain of e-mails               114
17   Exhibit 79    chain of e-mails               117
18   Exhibit 80    chain of e-mails               136
19   Exhibit 81    chain of e-mails               175
20   Exhibit 82    e-mail correspondence          186
21   Exhibit 83    chain of e-mails               193
22   Exhibit 84    chain of e-mails               198
23   Exhibit 85    e-mail correspondence          204
24
25       (Exhibits included with transcript.)
```

## Page 4

```
 1              P R O C E E D I N G S
 2       VIDEOGRAPHER:  Here begins Disc No. 1 in
 3  the videotaped deposition of Mark Pugerude in
 4  the matter of Genband Management Services
 5  Corporation vs. CoEfficient, LLC, and
 6  TelEfficient, LLC, vs. Genband Management
 7  Services Corporation, Genband Holdings Company
 8  and Genband US, LLC, in the District Court of
 9  Dallas County, Texas, Cause No. DC-16-12593.
10       Today's date is June 29, 2018.  The time
11  is 9:20 a.m.  This deposition is being held at
12  1299 Pennsylvania Avenue Northwest,
13  Washington, D.C.
14       The court reporter is Goldy Gold on
15  behalf of Dickman Davenport.  The videographer
16  is Pat Ruffner on behalf of Dickman Davenport.
17       Will counsel please introduce themselves
18  and state whom they represent.
19       MR. RUBENSTEIN:  Jonathan Rubenstein
20  from Baker Botts on behalf of the Genband
21  entities and the witness, and with me is my
22  colleague Allie Smith.
23       MR. BEXLEY:  Tyler Bexley.  I represent
24  CoEfficient and TelEfficient.
25       VIDEOGRAPHER:  Will the court reporter
```

**Page 5**

1  please swear in the witness.
2  WHEREUPON,
3      MARK L. PUGERUDE,
4  called as a witness, having been duly sworn, was
5  examined and testified as follows:
6  EXAMINATION BY
7  MR. BEXLEY:
8    Q.  Good morning, sir.
9    A.  Good morning.
10   Q.  Please state your full name.
11   A.  Mark L. Pugerude.
12   Q.  Mr. Pugerude, what is your business
13 address?
14   A.  My current business address?
15   Q.  Yes, sir.
16   A.  Actually, I don't know off the top of my
17 head.  Actually, it's 20405 Exchange Boulevard.
18   Q.  And what is your home address?
19   A.  4944 Trail Vista Lane.
20     (Reporter clarification.)
21     THE WITNESS:  4944 Trail Vista Lane,
22 Chantilly, Virginia 20151.
23 BY MR. BEXLEY:
24   Q.  You're here today to offer deposition
25 testimony regarding a lawsuit between Genband and my

**Page 6**

1  client, CoEfficient and TelEfficient, right?
2    A.  Correct.
3    Q.  And you received a deposition notice
4  indicating that your presence was required here
5  today?
6    A.  I did.
7    Q.  You've given a deposition before,
8  correct?
9    A.  I have.
10   Q.  So you know the gist of how it works and
11 the general rules for a deposition, right?
12   A.  I think so.
13   Q.  I'll go over a few ground rules, just so
14 we're on the same page.
15     Number one, you know that you just took
16 an oath to tell the truth, as if you're sitting and
17 testifying before a jury, right?
18   A.  I do.
19   Q.  And you know that this testimony might
20 be played by video or read to a jury in a trial in
21 Dallas, right?
22   A.  I do.
23   Q.  And you see that there is a court
24 reporter here today, and so because she has to take
25 down everything I ask and everything you answer, I

**Page 7**

1  will ask that you allow me to finish my question,
2  even if you know where I'm going with the question,
3  before you answer, and I will extend the same
4  courtesy to you of letting you finish your answer.
5      Is that okay?
6    A.  Okay.
7    Q.  And, similarly, because she has to take
8  everything down, you have to give audible yes-or-no
9  answers rather than a head nod or a shake of the
10 head, or "uh-huh," because that doesn't come across
11 in the transcript.
12     Is that okay with you?
13   A.  Okay.
14   Q.  If you need a break at any time, just
15 let me know, and I'll be happy to give you a break.
16 Okay?
17   A.  Sure.
18   Q.  Lastly, if I ask a question that you
19 don't understand, if it's not clear in some way,
20 will you just tell me that, and I'll try to clarify
21 the question?
22   A.  Sounds good.
23   Q.  All right.  You're represented here
24 today by the lawyers across the table from Baker
25 Botts, correct?

**Page 8**

1    A.  Correct.
2    Q.  And do you consider them to be your
3  personal counsel or company counsel for Genband?
4      MR. RUBENSTEIN:  Objection to form.
5      THE WITNESS:  I believe that they're
6  company counsel, and I've signed that they
7  represent me, yes.
8  BY MR. BEXLEY:
9    Q.  You have some sort of written document
10 to that effect?
11   A.  Correct.
12   Q.  When did you sign that?
13   A.  That was February.
14   Q.  Of this year?
15   A.  Yes.
16   Q.  And I understand you've given
17 depositions before, correct?
18   A.  I have.
19   Q.  How many times?
20   A.  I think, like, 12, 10 to 12 times.
21   Q.  When was the most recent deposition?
22   A.  It's hard to say.  Like -- it's probably
23 late fall last year, maybe.
24   Q.  And what type of case was that?
25   A.  Intellectual property lawsuit.

**Page 69**

1  Q.  And what about energy credit and energy
2  efficiency?  Did TelEfficient have expertise in
3  those areas?
4  A.  I don't know.  I never saw any proof of
5  that.
6  Q.  Was it conveyed to you at some point
7  that they might have expertise in that area?
8  A.  So, again, with the business model the
9  way it was, you basically enter into a long-term
10  services agreement, and you take all the bills, and
11  you reduce that power consumption, and then pay the
12  equipment off.
13     The notion of getting reclaimed energy
14  credits, those are programs that are in place for
15  every utility in every county in the United States
16  and most places in all of Western Europe because
17  they don't want to build more power plants.
18     So if you go to any building right here
19  in Washington, D.C., and you build a new building,
20  and you put in energy savings, and you have, like, a
21  drawdown that's less, the landlord will actually get
22  an energy credit.
23     So energy credits are for, like, capital
24  avoidance for the power company, right?  So if they
25  say, "If you put in this amount of power

**Page 70**

1  consumption, my plan is going to cost me $100,000,
2  so I'll give you a $20,000 credit not to make me
3  spend $100,000" -- so energy credits are kind of a
4  common thing.
5  Q.  So I guess my question is just whether
6  the business model of TelEfficient included a
7  component of using those energy credits in some way.
8  A.  If they were applicable, I think there
9  was that component.
10  Q.  For example, did you see financial
11  models that would have taken into account credits?
12  A.  I don't recall particularly, but I
13  wouldn't be surprised.
14  Q.  Now, you mentioned that you were the
15  person who was responsible for deciding whether or
16  not to go forward with the teaming agreement with
17  TelEfficient?
18  A.  Yes.
19  Q.  And why were you the person that was
20  tasked with that?
21  A.  I was president of the company.
22  Q.  And that wasn't something, for example,
23  Steve Bruny could do?
24  A.  I don't remember exactly the business
25  reasons why I was -- I mean, I was president, and

**Page 71**

1  usually -- anything that's unusual or different, you
2  know, usually has to go up to either me or Daryl.
3  Q.  And this was unusual and different?
4  A.  It was different.
5  Q.  And you did ultimately decide to move
6  forward with the teaming agreement with
7  TelEfficient, right?
8  A.  I did.
9  Q.  Why?
10  A.  Like I stated in earlier testimony, I
11  appreciated the marketing aspect of it.  You know,
12  everything was green back then, so I felt like we
13  were drafting in behind some market dynamics that
14  were appealing to customers.
15     We were doing work with -- as I recall,
16  doing some work, like, with the FCC and trying to be
17  more engaged with the federal government, with
18  Department of Defense contracts and the like.  So we
19  felt like it had some benefits in that regard to
20  promote, you know, kind of some good things.
21     We have also heard, as I recall, like,
22  from some of the carriers that they had, you know,
23  maybe management targets to reduce their energy
24  consumption, because everything was all about green
25  back then.

**Page 72**

1     So, yes, it was those things.  Like,
2  everything was, you know, geared towards being
3  green, and that's probably why we liked it.
4  Q.  So you entered into a teaming agreement
5  with TelEfficient with hopes that they would give
6  you something additional to market to carriers like
7  AT&T and Verizon?
8  A.  Yes, absolutely.
9  Q.  And it was your hope and expectation
10  that TelEfficient can help Genband close deals with
11  those customers, true?
12  A.  Without question.
13  Q.  Do you recall, in fact, stating at one
14  point in time that you thought this business
15  arrangement with TelEfficient was a $200 million
16  idea?
17  A.  If you're saying I have an e-mail that
18  says that, then -- I don't recall saying that.  I
19  don't recall saying that.
20  Q.  Would that surprise you?
21  A.  Well, I would think about the rollup of
22  business with AT&T, Verizon, Portugal -- yes.  The
23  net sum of all the potential business that could be
24  the total addressable market for this opportunity,
25  that could be possible.

**Page 77**

1  So what happened was network
2  transformation happened on a smaller scale.  So
3  instead of doing 100 switches in one time, they
4  would do two or four or six.  So, you know, instead
5  of building a brand-new bridge, we would just, you
6  know, paint over the old one.
7       So that's what I mean by "a massive
8  scale."  It always happens.  It happens right now.
9  It just didn't happen en masse.
10      Q.  So if I understand what you just said,
11 the carriers or the telecommunications companies
12 were having a hard time making the financial or
13 business case for doing a large-scale network
14 transformation process; is that fair?
15      A.  For large scale, yes.
16      Q.  And you viewed TelEfficient as offering
17 some possible alternatives to the telecommunications
18 companies to get them to see the economics?
19      A.  We were hopeful.
20      Q.  And you went on to write after that
21 sentence, "This deal construct is working on paper,"
22 right?
23      A.  I do.
24      Q.  When you say "this deal construct,"
25 you're talking about the TelEfficient deal

**Page 78**

1  construct, right?
2       A.  Yes.  Services contract, yes.
3       Q.  And then you go on, "I tried to make
4  sure you and your team got involved earlier and
5  often.  I feel like we are behind now.  This is and
6  always has been a good idea."
7           Right?
8       A.  Right, right.
9       Q.  When you say, "This is and always has
10 been a good idea," you're saying TelEfficient and
11 the business idea that they are offering is and has
12 always been a good idea?
13      A.  Yes.
14      Q.  Then you wrote, "Walsh has high-level
15 visibility with this now.  He will probably end up
16 trying to use them for InterTech as well."
17          Do you see that?
18      A.  I do.
19      Q.  What did you mean by "Walsh has
20 high-level visibility with this now"?
21      A.  He had high visibility.
22      Q.  Well, this means TelEfficient?
23      A.  Yes.
24      Q.  Why did Walsh at this point, in
25 September of 2013, have high-level visibility with

**Page 79**

1  TelEfficient?
2       A.  My bet is -- I don't recall.  Either I
3  had briefed him or Steven had briefed him.
4       Q.  And he was interested in the concept?
5       A.  Yes.
6       Q.  Why was he interested in the concept of
7  TelEfficient to the point where he'd have high-level
8  visibility with it?
9           MR. RUBENSTEIN:  Objection to form.
10          THE WITNESS:  As I said in earlier
11 testimony, he was a professional investor and
12 was, you know, keen on business dealings and
13 financial dealings and financial engineering,
14 so he liked the concept of the combination of
15 green financing and appealing to that kind of
16 business.
17 BY MR. BEXLEY:
18      Q.  Do you recall, after this point, if he
19 got involved directly in communications with Murat?
20      A.  I'm sorry.  Can you say that again?
21      Q.  Do you recall, after this point, whether
22 he got involved directly in conversations with Murat
23 Armbruster?
24      A.  I don't think so.  I don't know.
25      Q.  And then that parenthetical you wrote,

**Page 80**

1  "He will probably end up trying to use them for
2  InterTech, as well."
3           What is InterTech?
4       A.  Well, this runs back -- I got to go back
5  on the memory banks, but InterTech was an
6  interesting concept.  It was a -- it was an energy
7  idea -- energy savings idea for cooling data
8  centers.  And these data centers were basically --
9  had these Lego connected pipes that all went into
10 all the servers, and they had the special inner gas
11 that basically was a heat absorber.
12          So instead of having fans, you know,
13 powering and chilling off these servers, that burned
14 a lot of electricity and created a lot of heat, this
15 weird, like, construct of this gas absorbing heat
16 would cool down these data centers.
17          And I think Mr. Walsh was an investor
18 and very high on the business, so he wanted to see
19 how combining InterTech, green -- so we were very
20 much into, you know, figuring out ways how to get on
21 the green bandwagon, and InterTech was another one
22 of those ideas.
23      Q.  InterTech was not a Genband subsidiary,
24 was it?
25      A.  No.

**81**

1  Q. It was a separate sort of stand-alone
2  company?
3  A. Correct.
4  Q. And do you know if it was owned, in
5  whole or in part, by One Equity Partners?
6  A. I don't know their economic -- I don't
7  remember the ownership structure, no.
8  Q. But you knew that Mr. Walsh had some
9  interest in InterTech, right?
10  A. I'm fairly certain he had an economic
11  interest in the company.
12  Q. Do you know if he was on the board or in
13  an executive position in the company?
14  A. I don't think he was an executive. I
15  don't know about the board.
16  Q. Do you know Alex Russo, who was a board
17  member of Genband at one point in time?
18  A. I do.
19  Q. Do you know if he had an interest in
20  InterTech, as well?
21  A. He might have. I don't know.
22  Q. Do you know if he was on the board of
23  InterTech, as well?
24  A. I do not.
25  Q. Do you have a recollection of specific

**82**

1  discussions about why Mr. Walsh would probably end
2  up trying to use TelEfficient for InterTech?
3  A. So similar to these network
4  transformation deals that are big in scale,
5  InterTech had the same, I think, financial
6  encumbrances of getting something really big done
7  versus something, you know, on a smaller scale, so I
8  think that bundling everything together on paper
9  seemed like we could take advantage of a lot of
10  market dynamics, you know.
11  Q. So there was a thought there were some
12  synergies between TelEfficient and InterTech?
13  A. I think no. Actually, it was more the
14  three companies all providing a energy-efficient
15  solution. That's -- I think that's probably the
16  better way to say it.
17  Q. I got it.
18      So the idea was that you can take
19  Genband, InterTech and TelEfficient, and all three
20  together provide some green solution to customers?
21  A. Correct.
22  Q. Do you know if there were any more
23  in-depth conversations about using InterTech and
24  TelEfficient together?
25  A. Not by me.

**83**

1  Q. You weren't involved in any of those
2  types of discussions?
3  A. I wasn't -- I didn't promote InterTech.
4  Q. You didn't have any financial interest
5  in InterTech, right?
6  A. I did not.
7  Q. Then you conclude in this e-mail -- you
8  write, "Please just give this your attention and see
9  if we can get this normalized. We need you and your
10  team's brain power on this. We need to make this
11  work. It is possibly a $200 million idea."
12      Right?
13  A. There you go.
14  Q. So when you say, "It is possibly a
15  $200 million idea," you're referring to the business
16  relationship between TelEfficient and Genband,
17  right?
18  A. No. That would be $200 million for
19  Genband, yes.
20  Q. Working together with TelEfficient was a
21  $200 million idea for Genband, possibly?
22  A. For Genband, yes.
23  Q. So would that refresh your recollection
24  that as of September 2013, you thought TelEfficient
25  was a good idea?

**84**

1  A. Yes.
2  Q. And then as of September 2013, you
3  thought that Genband could realize $200 million from
4  working with TelEfficient?
5      MR. RUBENSTEIN: Objection to the form.
6      THE WITNESS: That would be -- as I
7  said, it's possibly a $200 million idea that
8  we could possibly go and get that much
9  revenue.
10  BY MR. BEXLEY:
11  Q. Do you recall the circumstances
12  surrounding your sending of Exhibit 75?
13  A. I do not.
14  Q. Do you recall there being issues with
15  Mr. Raiford approving deals involving TelEfficient?
16  A. I do not.
17  Q. Do you recall Mr. Raiford having
18  problems or issues with TelEfficient?
19  A. Yes.
20  Q. What do you recall about that?
21  A. I remember skepticism. I remember
22  concern, you know, confusion.
23  Q. Were there delays caused by Mr. Raiford?
24  A. Like, he would delay?
25  Q. Yes, sir.

## Page 173

1  A.  I do not.
2      (Reporter clarification.)
3      THE WITNESS:  I do not.
4  BY MR. BEXLEY:
5  Q.  Can you think of any instance in which
6  Genband was not truthful with Mr. Armbruster or
7  anyone else at TelEfficient?
8  A.  No.
9  Q.  Can you think of any instance in which
10 Genband was not fully forthcoming with
11 Mr. Armbruster or anyone else at TelEfficient?
12 A.  No.
13 Q.  So we've just been talking a little bit
14 about the notes, the bridge loan.  Tell the jury how
15 the bridge loan came about, the first one.
16 A.  I don't recall exactly all the details,
17 but I remember a scenario in which they had either
18 three or four people employed at TelEfficient, and
19 Murat had told me he was either letting them go or
20 do something -- because there was financial
21 difficulties, and that his syndicate or his other
22 investors, or whatever, weren't participating, and
23 they needed funding, and, you know, there was kind
24 of bare minimalist funding.
25 Q.  Is it common practice for Genband to

## Page 174

1  loan money to a business partner like TelEfficient?
2  A.  It is not.
3  Q.  How many other instances, during your
4  time at Genband, can you recall making a bridge
5  loan?
6  A.  Zero.
7  Q.  Why, then, in this case was the decision
8  made that it was a good idea to make a bridge loan?
9  A.  So, again, this is more my business call
10 than others, but I had been working on the Rubik's
11 cube of large-scale network transformation for the
12 better part of half a decade, and I tried many, many
13 different scenarios, and it was proving elusive.
14     And I thought this needed refinement.
15 It would have a chance.  It needed refinement.  It
16 needed a little bit more -- I thought, you know,
17 just one willing participant to do it, and we will
18 get better at it, and then we'd be able to replicate
19 it.
20     So I was willing -- and knew that from a
21 financial construct, we couldn't do it, ourselves,
22 for the reasons I earlier testified.  So it really
23 just came down to a matter of optionality.  I can
24 invest in more salespeople.  I can invest in other
25 things.  I chose to invest in this way to keep it

## Page 175

1  going.
2  Q.  And it was your ultimate decision to go
3  forward with the bridge financing?
4  A.  I would say that it couldn't have
5  happened without me championing it, I would say.  I
6  would say it was primarily me and Daryl.
7  Q.  And certainly, you would not have
8  championed this financing of TelEfficient if you did
9  not believe that TelEfficient can bring some value
10 to Genband, right?
11 A.  Yes.  I thought we could do it,
12 absolutely.
13 Q.  And you would not have championed this
14 financing of TelEfficient if you didn't think that
15 TelEfficient could help Genband close deals, right?
16 A.  Yes, that is true.
17 Q.  I'm handing you a document marked as
18 Exhibit 81.
19     [Whereupon, Exhibit 81, chain of
20     e-mails, was hereby marked as for
21     identification, as of this date.]
22 BY MR. BEXLEY:
23 Q.  Exhibit 81 is an e-mail from you to
24 members of Genband's executive team about this --
25     (Reporter clarification.)

## Page 176

1  BY MR. BEXLEY:
2  Q.  -- Genband's executive team about
3  this -- one of the financing requests from
4  Mr. Armbruster, right?
5  A.  Yes.
6  Q.  And you see it actually starts with an
7  e-mail from Mr. Armbruster, himself, to Steve Bruny,
8  saying he's wondering "if there was a decision made
9  about TelEfficient funding at yesterday's meeting,"
10 right?
11 A.  Yes.
12 Q.  And do you know what meeting that would
13 have been?  Was that a board meeting?
14 A.  Well, that's a July time frame, so my
15 bet was it was a board meeting.  After June, yes, it
16 was probably a board meeting, I would suspect.
17 Q.  Did the board sign off on making loans
18 to TelEfficient?
19 A.  I don't know if the board signed off on
20 it.  I think we had to give board notification, you
21 know.  I don't think they had to have approval.  I
22 could be wrong about that.  I don't remember
23 exactly.
24 Q.  Why would you have to give the board
25 notification about the loans?

**189**

1  and not the fact that the 1A transaction had been
2  closed without TelEfficient financing at all, right?
3       MR. RUBENSTEIN:  Objection to form.
4       THE WITNESS:  "In light of delays in
5    closing the AT&T 1A transaction."  Yes, that's
6    what it appears.
7  BY MR. BEXLEY:
8     Q.   And so they must believe that there was
9  still a chance that the 1A deal would close with
10 TelEfficient financing, right?
11    A.   Sure.
12    Q.   And do you see this detail of expenses:
13 personnel, rent and overhead, travel, and then total
14 expenses, and debt service?
15    A.   Uh-huh, yes.
16    Q.   "Yes"?
17         And this appears to be an itemization of
18 the expenses that TelEfficient has incurred, or
19 expects to incur, right?
20    A.   Expects to incur, yes.  This looks like
21 a budget.
22    Q.   And so you knew that TelEfficient was
23 continuing to incur expenses in its work on Genband
24 projects, right?
25    A.   Yes.

**190**

1     Q.   And ultimately, Genband decided to make
2  this loan, right?
3     A.   We did.
4     Q.   And would that be for the same reasons
5  as the first bridge loan you've already discussed?
6     A.   Yes.
7     Q.   And Mr. Armbruster also wrote in that
8  first paragraph, "This should provide the
9  appropriate runway for us to close our first
10 transaction and pay back the loan."
11         Right?
12    A.   Yes.
13    Q.   And so you knew that TelEfficient was
14 intending to pay back the loan from revenue earned
15 from a closed transaction, right?
16    A.   Yes.
17    Q.   And you knew TelEfficient had no other
18 source of revenue at that time, right?
19         MR. RUBENSTEIN:  Objection to form.
20         THE WITNESS:  I do not know that.
21 BY MR. BEXLEY:
22    Q.   Did you believe TelEfficient to be
23 generating cash flow or revenue outside of its work
24 for Genband?
25    A.   Well, that's not their only source of

**191**

1  capital.  They can go and raise money, themselves.
2     Q.   Put aside capital.  I'm talking about
3  revenue from earnings.
4     A.   I hear you.
5     Q.   So you knew they weren't earning money
6  from work outside of Genband, right?
7     A.   Yes.  I'm choosing the answer which is,
8  it doesn't matter whether they got it through
9  revenue or capital raise.  They can get enough money
10 to stay in business either way.  They had investors
11 before they met us.
12         MR. BEXLEY:  Objection.  Nonresponsive.
13 BY MR. BEXLEY:
14    Q.   And I appreciate what you're saying, but
15 I have a direct and simple question, and I would
16 appreciate it if you can answer it.  If you can't,
17 that's fine.  I understand.
18    A.   Sure, sure.
19    Q.   If you know, did TelEfficient have any
20 source of revenue or cash flow outside of Genband?
21    A.   No.
22    Q.   Do you remember Mr. Armbruster
23 requesting a comfort letter for one of his
24 investors, Bostonia, at some point?
25    A.   I do recall something like that.

**192**

1     Q.   And what was your reaction to that
2  request?
3     A.   I remember being slightly annoyed.
4     Q.   Why?
5     A.   Because we were in discomfort, and we
6  were spending money and time and two years of
7  effort.  And, you know, the Bostonia guys were kind
8  of new on the scene, and they already wanted, you
9  know, economic, you know, recovery and other things.
10 And, you know -- that's how I remember it.
11    Q.   So your annoyance was with Bostonia and
12 not with TelEfficient?
13         (Reporter clarification.)
14 BY MR. BEXLEY:
15    Q.   Your annoyance was with Bostonia and not
16 with TelEfficient?
17    A.   I think I was just annoyed.  I can't
18 say -- it was frustration, maybe.  Frustration.
19    Q.   You knew TelEfficient was, to use your
20 term, in discomfort, also, and had spent a lot of
21 money, right?
22         MR. RUBENSTEIN:  Objection to form.
23         THE WITNESS:  I don't know how much they
24    had spent.  I know how much we had spent.
25 BY MR. BEXLEY: