# EXHIBIT 3

```
 1                      NO. DC-16-12593
 2  GENBAND MANAGEMENT SERVICES ) IN THE DISTRICT COURT
    CORPORATION,                )
 3                              )
 4       Plaintiff,             )
                                )
    VS.                         )
 5                              )
    COEFFICIENT, LLC and        )
 6  TELEFFICIENT, LLC,          )
                                )
 7       Defendants/            )
         Counter-Plaintiffs     ) DALLAS COUNTY, TEXAS
 8  VS.                         )
                                )
 9  GENBAND MANAGEMENT SERVICES )
    CORPORATION, GENBAND        )
10  HOLDINGS COMPANY AND        )
    GENBAND US, LLC,            )
11                              )
         Counter-Defendants.    ) 116TH JUDICIAL DISTRICT
12
13
14                      CONFIDENTIAL
15            ORAL AND VIDEOTAPED DEPOSITION OF
16                      DARYL RAIFORD
17                      MAY 15, 2018
18
19
20
21
22
23
24
25
```

1              ORAL AND VIDEOTAPED DEPOSITION of DARYL

2     RAIFORD, produced as a witness at the instance of the

3     Defendants/Counter-Plaintiffs, and duly sworn, was

4     taken in the above-styled and numbered cause on the

5     15th of May, 2018, from 10:06 a.m. to 4:14 p.m.,

6     before Audra B. Paty, CSR in and for the State of

7     Texas, reported by machine shorthand, at the offices

8     of Baker Botts LLP, 2001 Ross Avenue, in the City of

9     Dallas, County of Dallas, State of Texas, pursuant to

10    Notice and the Texas Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                A P P E A R A N C E S
 2       FOR THE PLAINTIFF/COUNTER-DEFENDANTS:
              Mr. Jonathan B. Rubenstein
 3            Ms. Allie Smith
              BAKER BOTTS LLP
 4            2001 Ross Avenue
              Suite 1100
 5            Dallas, Texas 75201-2980
              214.953.6594
 6            jonathan.rubenstein@bakerbotts.com
              allie.smith@bakerbotts.com
 7
 8       FOR THE DEFENDANTS/COUNTER PLAINTIFFS:
              Mr. Tyler J. Bexley
 9            REESE MARKETOS, LLP
              750 North St. Paul Street
10            Suite 600
              Dallas, Texas 75201
11            214.382.9805
              tyler.bexley@rm-firm.com
12
13       ALSO PRESENT:
              Mr. Wayne Rennke, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

1                        I N D E X
2  WITNESS                                    PAGE
3  DARYL RAIFORD
4  EXAMINATION BY MR. BEXLEY                    7
5
   CORRECTIONS MADE BY WITNESS                235
6
   SIGNATURE OF WITNESS                       236
7
   REPORTER'S CERTIFICATION                   237
8
9  EXHIBITS                               IDENTIFIED
10 Exhibit 1 - Ribbon Communications, Inc.
             Structure Chart as of
11           January 1, 2018                   35
12 Exhibit 2 - E-mail string top e-mail being
             8-6-13 Pugerude e-mail to
13           Raiford                           79
14 Exhibit 3 - 8-6-13 Lakey e-mail to Pugerude  87
15 Exhibit 4 - Amended and Restated Teaming
             Agreement                         89
16
   Exhibit 5 - E-mail string top e-mail being
17           9-27-13 Raiford e-mail to Walsh,
             Wright, Pugerude and others      107
18
   Exhibit 6 - E-mail string top e-mail being
19           9-28-13 Walsh e-mail to Raiford,
             Wright, and Pugerude and others  113
20
   Exhibit 7 - 12-9-14 Raiford e-mail to
21           Reichert                         120
22 Exhibit 8 - E-mail string top e-mail being
             12-11-14 Raiford e-mail to Bruny,
23           Pugerude, Green and others       124
24 Exhibit 9 - 3-11-15 Raiford e-mail to Stevens
             with attachments                 127
25

Case: 18-41932   Doc# 25-4   Filed: 10/17/18   Entered: 10/17/18 17:19:28   Page 5 of
9

```
1   EXHIBITS                                        IDENTIFIED
2   Exhibit 10 - E-mail string top e-mail being
                  7-23-14 Raiford e-mail to
3                 Pugerude, Walsh and Green         137
4   Exhibit 11 - Memorandum of Understanding        152
5   Exhibit 12 - E-mail string top e-mail being
                  3-3-14 Casper e-mail to Raiford   153
6
    Exhibit 13 - E-mail string top e-mail being
7                 1-7-16 Leopardi e-mail to Bishop
                  and Ableman with attachment       162
8
    Exhibit 14 - 1-6-16 Brennan e-mail to Raiford   175
9
    Exhibit 15 - E-mail string top e-mail being
10                8-8-16 Raiford e-mail Brennan     176
11  Exhibit 16 - E-mail string top e-mail being
                  5-6-12 Raiford e-mail to Russo    179
12
    Exhibit 17 - E-mail string top e-mail being
13                7-20-14 Pugerude e-mail to Lauro,
                  Raiford, and O'Connor             189
14
    Exhibit 18 - E-mail string top e-mail being
15                7-10-14 Raiford e-mail to
                  Armbruster and Walsh              191
16
    Exhibit 19 - E-mail string top e-mail being
17                7-2-14 Raiford e-mail to Inshaw   194
18  Exhibit 20 - E-mail string top e-mail being
                  7-7-15 Raiford e-mail to Murray   198
19
    Exhibit 21 - E-mail string top e-mail being
20                7-8-15 Raiford e-mail to
                  Armbruster                        200
21
    Exhibit 22 - E-mail string top e-mail being
22                4-22-15 Raiford e-mail to Walsh   203
23  Exhibit 23 - E-mail string top e-mail being
                  9-22-15 Raiford e-mail to Russo
24                and Walsh                         210
25
```

```
1   EXHIBITS                                    IDENTIFIED
2   Exhibit 24 - 1-22-16 Raiford letter to
                 CoEfficient and TelEfficient      223
3
    Exhibit 25 - 8-15-16 Raiford e-mail to Bruny    227
4
    Exhibit 26 - 5-30-17 Raiford e-mail to Bruny,
5                Russo and Ableman                  229
6   Exhibit 27 - 12-20-17 Raiford e-mail to         231
                 Thaler
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**7**

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We are on the video
3  record at 10:06 a.m. beginning media number 1 of the
4  videotaped deposition of Daryl Raiford.
5        Today's date is May 15th, 2018.  If the
6  attorneys present would please state their appearance
7  for the record as well as any agreements, after which
8  the court reporter would please swear in the
9  witness.
10       MR. RUBENSTEIN:  Jonathan Rubenstein for
11  Baker Botts on behalf of the GENBAND entities and the
12  witness, and with me is my colleague Allie Smith.
13       MR. BEXLEY:  Tyler Bexley from the law
14  firm of Reese Marketos representing the defendant and
15  counter-claimants CoEfficient and TelEfficient.
16             DARYL RAIFORD,
17  having been first duly sworn, testified as follows:
18             EXAMINATION
19  BY MR. BEXLEY:
20    Q.  Good morning, sir.
21    A.  Good morning.
22    Q.  Will you please state your full name?
23    A.  Daryl Edward Raiford.
24    Q.  And, Mr. Raiford, where are you from?  Where
25  do you currently live?

**8**

1    A.  I reside -- my homestead is in Austin, Texas.
2    Q.  What is your home address?
3    A.  201 Sanostee Cove, Austin, Texas 78733.
4    Q.  And you understand you're here today to
5  testify in a lawsuit between several GENBAND entities
6  and my clients TelEfficient and CoEfficient?
7    A.  Yes.
8    Q.  Have you ever given a deposition before?
9    A.  Yes.
10    Q.  How many times?
11    A.  At least twice.
12    Q.  When was the most recent deposition you gave?
13    A.  2005.
14    Q.  And was that in your capacity as an employee
15  for some company was that --
16    A.  Yes.
17    Q.  -- in a personal capacity?
18    A.  As an employee.
19    Q.  What company?
20    A.  Travelport Limited.
21    Q.  And what was just the general nature of that
22  lawsuit?
23    A.  Related to a dispute over an earnout in an
24  acquisition transaction.
25    Q.  And how were you involved in that?

**9**

1    A.  I was the CFO.
2    Q.  And then prior to that, when is the most
3  recent deposition before 2005?
4    A.  Would have been 2002.
5    Q.  And was that in a corporate capacity or
6  personally?
7    A.  That was in a corporate capacity.
8    Q.  What company were you with at that time?
9    A.  Compaq Computer Corporation.
10    Q.  And what was the general nature of that
11  lawsuit?
12    A.  The Hewlett family had sued -- filed to block
13  the merger of Hewlett Packard and Compaq Computer
14  Corporation.  It was in a Delaware court.
15    Q.  Any other lawsuits that you can remember
16  providing a deposition in?
17    A.  No.
18    Q.  Any testimony at trial in a lawsuit?
19    A.  No.
20    Q.  Any other types of hearings or court
21  proceedings where you've testified?
22    A.  Within -- recently within the last year, I
23  appeared at a sentencing hearing for a -- in a federal
24  court for a criminal trial.
25    Q.  And what was your relation to the defendant

**10**

1  or to the proceeding?
2    A.  The defendant was the criminal that had been
3  found guilty and the -- he was a Nigerian national
4  that defrauded the company through wire fraud.  And so
5  I appeared before -- in the -- appeared before the
6  court to, you know, explain the situation and ask for
7  grave sentencing.
8    Q.  All right.  And when you say the company, are
9  you referring to GENBAND?
10    A.  Yes.
11    Q.  And that was, you said, within the last year
12  or so?
13    A.  Right.  July -- I believe July or August
14  2017.
15    Q.  And do you recall what court that was in?
16    A.  No, but it is here in Dallas.  It is the
17  federal district court in Dallas.
18    Q.  The United States District Court for the
19  Northern District of Texas?
20    A.  Yeah.
21    Q.  Okay.  So since you have given depositions
22  before, I won't belabor the point too much, but just a
23  couple of grounds rules so we're on the same page.
24  Number one that I think we've violated a little bit
25  inadvertently already is we want to make sure not to

Daryl Raiford - Confidential - May 15, 2018

131

1    A. No, no.
2        MR. BEXLEY: All right. Take a break.
3        THE VIDEOGRAPHER: Off the record. The
4    time is 12:57 p.m.
5        (Recess 12:57 to 1:49.)
6        THE VIDEOGRAPHER: We're going back on
7    the record. The time is 1:49 p.m.
8        Q. (BY MR. BEXLEY) Good afternoon, Mr. Raiford.
9    Welcome back from lunch.
10       A. Thank you.
11       Q. At some point during GENBAND's relationship
12   with TelEfficient, did GENBAND decide to begin making
13   loans to TelEfficient?
14       A. Yes.
15       Q. Do you recall when the idea or the notion of
16   making loans or issuing notes to TelEfficient was
17   first raised?
18       A. The date?
19       Q. Just the rough time of year, if you don't
20   recall an exact date.
21       A. No. No, I'm sorry.
22       Q. So if the first note was executed August 8th,
23   2014, do you have a thought of how far before that
24   process would have started -- that discussion process
25   would have started?

132

1        A. Not -- not precisely, but I don't believe it
2    would be too much before that.
3        Q. Do you recall who first broached the subject
4    of issuing loans to TelEfficient?
5        A. TelEfficient.
6        Q. Who specifically from TelEfficient?
7        A. Murat.
8        Q. Do you know what the circumstances were that
9    caused that idea to come out from Mr. Armbruster?
10       A. I was told by Murat that he needed funding to
11   continue going with his company.
12       Q. Do you know how TelEfficient had been funded
13   prior to that time?
14       A. At that time, I did not know, but in
15   subsequent diligence I learned that there had been --
16   that investors had invested into his company as well
17   as he was carried by some of his suppliers like his
18   attorneys who he had accrued fees to but allowed him
19   to not make payments.
20       Q. Who did Mr. Armbruster first approach with
21   the idea of GENBAND making loans?
22       A. I don't recall that specifically.
23       Q. Do you know if he came to you directly or if
24   you heard -- first heard of this through Mr. Bruny or
25   somebody else?

133

1        A. No, I do not believe it was -- I don't
2    believe the first conversation was to me directly. I
3    remember I was -- I -- I believe I was approached by
4    someone who I can't recall about the subject.
5        Q. Did you have internal discussions at GENBAND
6    over whether it was prudent to make loans to
7    TelEfficient?
8        A. I'm sorry. The question?
9        Q. Did you have internal discussions at GENBAND
10   about whether it was prudent to make loans to
11   TelEfficient?
12       A. Yes.
13       Q. With whom do you recall having those
14   discussions?
15       A. Mark Pugerude, Steven Bruny, and then ul --
16   to a larger extent. And then in a very limited
17   extent, I would think Alex Russo, a board member, and
18   David Walsh.
19       Q. Do you recall Adam Ableman having any
20   involvement in those discussions?
21       A. Well, yes, he was our attorney drafting the
22   agreements.
23       Q. Was he responsible for drafting the notes?
24           MR. RUBENSTEIN: Objection, form.
25       A. You know, if drafting means providing legal

134

1    counsel, yes.
2        Q. (BY MR. BEXLEY) Did he write the actual
3    documents that were signed?
4            MR. RUBENSTEIN: Objection, form.
5        A. I don't -- I presumed so unless he had a
6    staff attorney help him.
7        Q. (BY MR. BEXLEY) Why did GENBAND ultimately
8    agree to make loans to TelEfficient?
9        A. To -- to continue their financial solvency.
10       Q. Why was that important to GENBAND?
11       A. At the time, we had -- we had introduced
12   TelEfficient to some of our most important clients,
13   and they were considering a TelEfficient solution.
14   And we believe that if TelEfficient were to go
15   insolvent after we had introduced them, that it would
16   be an embarrassment to our company.
17       Q. You could have certainly just said no, no
18   funding and made TelEfficient either find funding
19   elsewhere or become insolvent, right?
20       A. That's correct.
21       Q. There was no obligation in the teaming
22   agreement or other legal documents between you and
23   TelEfficient at that time that obligated GENBAND to
24   make loans, right?
25       A. That's correct.